**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Kathy KOOPMANS, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Douglas HENRY, Defendant-Appellant.**

**Nos. 83–3200, 83–3201.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 5, 1984.

Decided March 18, 1985.

Thomas D. Sykes, Asst. U.S. Atty., John R. Byrnes, U.S. Atty., Madison, Wis., for plaintiff-appellee.

Susan J.M. Bauman, Thomas, Parsons, Schaefer & Bauman, Madison, Wis., for defendants-appellants.

Before CUMMINGS, Chief Judge, and WOOD and ESCHBACH, Circuit Judges.

ESCHBACH, Circuit Judge.

In these consolidated appeals by codefendants convicted of introducing marijuana into a federal prison in violation of 18 U.S.C. § 1791 and 28 C.F.R. § 6.1, we are asked to decide whether the Attorney General unlawfully delegated his authority in adopting 28 C.F.R. § 6.1, whether a certain hearsay statement is admissible under the co-conspirator exception to the hearsay rule, whether the testimony of a government expert should have been excluded as a sanction for the government's failure to provide to defendants the test results on which the testimony was based, and whether the evidence was sufficient for conviction. We affirm both convictions.

## I

Defendant/appellant Douglas Henry, a prisoner in the Federal Correctional Institution, Oxford, Wisconsin ("FCI Oxford"), was a friend of fellow prisoner Donald Norris. They often talked about ways to get drugs into prison. In early 1982 Norris placed an ad in the Wisconsin State Journal, ostensibly soliciting the friendship and correspondence of a sincere woman between the ages of 18 and 40. Five women responded, among them defendant/appellant Kathy Koopmans, a former special education student. Norris and Koopmans began writing to each other in April 1982; she wrote three or four letters to him. Norris told Henry about the women with whom he was corresponding, and Henry, wanting someone to bring him drugs, asked Norris if he might write to one of them. Norris gave Henry Koopmans's address and the letters he had received from her.

On March 6, 1983, Koopmans visited Henry at the prison. She filled in a questionnaire regarding the introduction of contraband, signed a visitor's log, passed through a metal detector, and emptied her pockets and wallet to have the contents examined. While the two were together in the visiting room, a guard secretly observed Henry several times putting his hand in Koopmans's pocket, removing his hand, putting it to his mouth, putting something in his mouth, and sipping a soft drink. At the end of the visit Henry was taken to a dry cell. Three days later he passed eight balloons, which were found to contain a green leafy substance. When questioned, he claimed that he got the balloons from another inmate in the visiting room, not from Koopmans. FBI laboratory tests produced an identification of the substance in the balloons as marijuana.

Three weeks later, an FBI agent interviewed Koopmans, explaining to her that he was there to investigate her visit of March 6, after which eight balloons of marijuana were recovered from Henry, in violation of federal law. She answered, "I only did it once."

On June 10, 1983, Koopmans and Henry were indicted on one count of introducing marijuana into FCI Oxford, in violation of 18 U.S.C. § 1791 and 28 C.F.R. § 6.1. A jury found them guilty, and they were convicted on December 6, 1983. Henry was sentenced to serve five years imprisonment, consecutively to the sentence he was then serving, and Koopmans was placed on three years probation under the Youth Corrections Act, required to reside for 120 days at a halfway house, and forbidden to visit, correspond, or communicate with any state or federal prisoner without her parole officer's permission. Koopmans has now completed the period of residency.

## II

### A. The Challenge to 28 C.F.R. § 6.1

■ The statute under which Koopmans and Henry were charged provides as follows:

Whoever, contrary to any rule or regulation promulgated by the Attorney General, introduces or attempts to introduce into or upon the grounds of any Federal penal or correctional institution or takes or attempts to take or send therefrom anything whatsoever, shall be imprisoned not more than ten years.

18 U.S.C. § 1791. The pertinent regulation promulgated by the Attorney General states:

The introduction or attempt to introduce into or upon the grounds of any Federal penal or correctional institution or the taking or attempt to take or send therefrom anything whatsoever without the knowledge or consent of the warden or superintendent of such Federal penal or correctional institution is prohibited.

28 C.F.R. § 6.1. The regulation tracks the language of the statute and has the effect of subdelegating to the warden or superintendent of each federal penal or correctional institution the authority to make rules designating items that shall constitute contraband. *See United States v. Park*, 521 F.2d 1381, 1383 (9th Cir.1975) (per curiam).

Koopmans and Henry argue that the Attorney General abused his discretion in adopting § 6.1, because he failed to make any reasoned determination of what things constitute contraband. Congress intended for the Attorney General to make that determination, they contend, but instead of doing so, the Attorney General impermissibly delegated the authority to wardens and superintendents. They argue further that the regulation confers on the warden or superintendent an unbridled discretion, subject to no standards; he could adopt arbitrary rules or permit lobby officers to make arbitrary determinations, even banning clothing, shoes, or glasses.

We find no merit in these arguments. There is no indication that Congress intend-ed to forbid the Attorney General to subdelegate the authority to determine what is contraband, and it is unreasonable to impute to Congress such an intention in the absence of any such indication. Different federal penal and correctional institutions have different levels of security, and it is reasonable to permit the warden or superintendent of each institution to tailor the contraband list to the security requirements of the institution. *See Carter v. United States*, 333 F.2d 354, 355 (10th Cir. 1964). We agree with appellants that Congress intended that the Attorney General exercise discretion in adopting rules pursuant to 18 U.S.C. § 1791. But we think that the Attorney General did exercise discretion in deciding to leave it to the wardens and superintendents to determine what is contraband, and we see no reason to think that Congress intended to preclude him from exercising his discretion in that way. Thus we reject the contention that because the Attorney General exercised his discretion in a way that Congress intended to forbid, 28 C.F.R. § 6.1 is void.

It is true that the regulation delegates authority to wardens and superintendents without expressly providing standards for their guidance. But appellants cannot seriously complain either that they were convicted of violating an arbitrary rule adopted by a warden pursuant to the regulation or that they did not have notice of the rule that they were charged with violating. It is independently clear that the classification of marijuana as contraband at FCI Oxford is not an arbitrary rule but an eminently reasonable one, a rule that wardens would be permitted to adopt under any reasonable standards that the Attorney General might have expressly promulgated. Henry clearly knew that marijuana was contraband. Koopmans was informed by the questionnaire that the lobby officer requires all visitors to complete. The questionnaire advises visitors that if they introduce any of the narcotics, drugs, or paraphernalia listed in it, they are subject to specified penalties. Koopmans signed the form when she entered the prison on March 6, thereby indicating that she had read and

understood it. She testified that she had visited Henry many times previously, and on each such occasion she would have been required to sign the same form. Thus there is no infirmity in these convictions arising from a standardless subdelegation.

## B. Admissibility Against Koopmans of Henry's Statement to Norris

Norris testified that he gave Koopmans's letters to Henry

> because he had been asking me for some people to write to for three or four weeks after he knew I was writing these people. And he was looking for somebody to bring in some drugs. That was the nature of our conversations we had with each other.

The trial court admitted this testimony against Koopmans under the co-conspirator exception to the hearsay rule, which provides that a statement is not hearsay if it is offered against a party and is a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E). Koopmans contends that this was error, on grounds that there is no independent evidence that she was involved in any conspiracy with Norris or Henry.

■ There is ample evidence, in the form of Norris's testimony, to establish that Norris and Henry were involved in a conspiracy to introduce drugs into the prison. There is also ample evidence, in the form of the testimony of prison employees and officials as to the conduct of Koopmans and Henry in the visiting room on March 6, 1983, and the recovery of the balloons from Henry three days later, to establish that Henry and Koopmans had conspired to introduce drugs into the prison. We think, however, that Norris's statement was not admissible under Rule 801(d)(2)(E), because there is no evidence that Koopmans was involved in the conspiracy of Norris and Henry. Norris testified on cross-examination that his "joint venture" with Henry had ended by September 1982, that they were not "on a cooperative basis for anything, drugs, girlfriends, visitors, privileges

of any kind after September of 1982," and that considerable animosity had developed between Norris and Henry by that time. This testimony was uncontradicted and unimpeached, and it compels the inference that any conspiracy between Norris and Henry had ended by September 1982. The evidence that Koopmans conspired with Henry does not show that Koopmans joined the conspiracy between Norris and Henry before it ended. It can be inferred that Koopmans and Henry conspired at some time before March 6, 1983, but the beginning cannot be dated more precisely. There is thus no evidence that Henry's statement to Norris was made during the course of a conspiracy that Koopmans later joined.

We hold nevertheless that the error in admitting Henry's statement through Norris was harmless, because there was more than sufficient evidence to support the verdict without it, as will appear more fully below. Indeed, the value of the hearsay statement is that it supports the inference that Henry induced Koopmans to bring him drugs. In view of the testimony concerning the events of March 6, 1983, separate evidence of that proposition is unnecessary.

## C. The Government's Failure to Produce Spectra

Before trial, Henry made a request under Fed.R.Crim.P. 16 for, among other things, "the results and reports of any scientific tests or experiments made in connection with the particular case." By letter of June 28, 1983, the government agreed to provide all Rule 16 material. Henry received an FBI laboratory report stating only that the specimen of unknown plant material was found to be marijuana.

Drew Richardson was the FBI chemist who had performed the analysis. During his examination at trial it developed that he had used a gas chromatograph to separate the chemical constituents of the material and a mass spectrograph to analyze the salient constituents thus isolated, with the help of a computer that interpreted the data and generated spectra. The computer

also matched the spectra obtained from the tested substances with reference spectra in its internal library. The resulting printouts graphically displayed the sample spectrum, the library spectrum that the computer selected as a match, and the result of subtracting the one from the other. The printouts show what appears to us to be a close match for cannabinol and a reasonably close match for tetrahydrocannabinol.

Henry contends that the government's failure to produce the spectra was a violation of its duty under Rule 16, and that the trial court should have granted his motion to strike Richardson's testimony and to exclude the laboratory report identifying the material as marijuana. We shall assume without deciding that the government was in violation of Rule 16, as the district court found. Section (d)(2) of the rule governs the remedy for a failure to comply:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.

Fed.R.Crim.P. 16(d)(2). Remedial action under this rule is committed to the sound discretion of the district court, and we will reverse only for abuse of discretion prejudicial to the substantial rights of the defendant. *See United States v. Bastanipour,* 697 F.2d 170, 175–76 (7th Cir.1982), *cert. denied,* 460 U.S. 1091, 103 S.Ct. 1790, 76 L.Ed.2d 358 (1983). We find in this case that there has been no showing of prejudice and that the district court did not abuse its discretion in denying Henry's motion.

It is clear from the transcript that Henry's cross-examination of Richardson was not handicapped by the government's failure to produce the spectra. Henry's attorney covered in minute detail the procedures Richardson followed in testing the plant material. He asked numerous leading questions concerning the functioning of the gas chromatograph and the mass spectrometer, which revealed that he had a firm grasp of their design and operation. During the cross-examination he asked Richardson whether these instruments produced spectra, and Richardson then showed him the spectra that are in question here. He asked leading questions about these spectra that revealed a thorough understanding of what they were. He was also able to elicit testimony that reflected adversely on Richardson's qualifications and the reliability of the instruments. It is clear that Henry's attorney was not unfairly surprised by the spectra.

Henry argues that if he had had the spectra before trial, he would have been able to consult his own experts and thereby challenge Richardson's trial testimony. This is not a compelling argument. He had the opportunity to request a continuance at trial for such a purpose, but he did not avail himself of it.[1] He does not even suggest, now after he has had these spectra for a considerable time, how they could be used to cast doubt on the identification of the plant material as marijuana. That Henry's attorney would have been able to prepare somewhat more specific questions about the spectra, or that he would have been able to consult an expert who might have appeared as a witness for the defense if his examination of the spectra revealed a basis for challenging the identification, is not enough to show prejudice.[2]

---

**1.** As an explanation for why he did not ask for a continuance, Henry's attorney said that he would not have known how long to ask for, and that the $300 limitation on reimbursement for expert services obtained by appointed counsel would have made it difficult to employ any expert. We think these are matters that should have been presented to the trial court, which

has broad discretion under Rule 16(d)(2) to fashion appropriate relief.

**2.** On direct examination Richardson testified that by means of the gas chromatographic and mass spectrographic analysis he identified tetrahydrocannabinol as present in the plant material, and that on the basis of this result he identi-

## D. Sufficiency of the Evidence

■ Koopmans contends that the government did not prove her guilty beyond a reasonable doubt. The standard we apply is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984).

■ There is no question that Koopmans visited Henry at FCI Oxford on March 6, 1983. There is no question that three days later Henry passed eight balloons containing a green leafy plant material. There is sufficient evidence, in the form of Drew Richardson's testimony and the FBI report of the results of testing the green leafy plant material, from which a jury could conclude beyond a reasonable doubt that the material was marijuana. The crucial question is whether there was evidence from which a jury could conclude beyond a reasonable doubt that Koopmans introduced those marijuana-filled balloons into FCI Oxford.

There is no direct evidence that Koopmans possessed marijuana-filled balloons when she entered the institution. She was not searched when she entered FCI Oxford on March 6, and the balloons were not found or observed on her person. There is, however, circumstantial evidence in the form of the testimony of Thomas Murdock and Thomas Madden.

Thomas Murdock was the correctional officer who, looking through a one-way mirror window, observed Koopmans and Henry engage in some unusual activity in the visiting room of FCI Oxford on March 6. He testified as follows:

A  I looked in, and I seen Henry had his hand in Ms. Koopmans' pocket.

Q  What happened next?

A  He took the hand out of the pocket, placed it to his mouth, stuck something in his mouth, took a sip out of the Pepsi he had in his hand.

Q  Could you see what he had in his hand?

A  No, not from that distance. I couldn't tell what he had, but he had something in his hand, and he placed his hand to his mouth again and tried to dry swallow it and had a difficult time getting it down. He took the third object, put it in his mouth, and took a sip of Pepsi.

Q  After you saw these things happen, what happened next?

A  He placed his hand back in her pocket, more or less did the same procedure, take a sip of Pepsi with one dry swallow, the next, take a sip of Pepsi with the third one.

Q  What happened next?

A  He reached into her pocket again and couldn't get nothing out. She scooted herself around, stuck her hand in her pocket and moved the objects around so he could get to them and scooted back up against him, and he reached back into her pocket again.

Q  And after he reached into her pocket again, what happened then?

A  He pulled out whatever she had in her pocket, placed his hand to his mouth, took a sip of Pepsi, and then put another object in his mouth, take another sip of Pepsi. Then he reached into her pocket again and

---

fied the plant material as marijuana. Henry suggests that Richardson's identification of the plant material as marijuana was put in question by Richardson's testimony on cross-examination that tetrahydrocannabinol is synthetically created and that he knew of no plant substance that contains tetrahydrocannabinol. In fact, the testimony that he knew of no plant substance that contains tetrahydrocannabinol was stricken from the record on the motion of Henry's attorney (and, oddly, over the opposition of the prosecutor). That statement is therefore not in evidence. That tetrahydrocannabinol is synthetically created is perfectly consistent with its occurring naturally in marijuana. Richardson did not say that it is *always* synthetically created, and many naturally occurring chemical compounds have been synthesized.

took two more objects and put them in his mouth and swallowed those with a sip of Pepsi.

Q  While this was occurring what was, if anything, was the woman he was with whose pocket he was reaching into, what was she doing?

A  She was watching the visiting room officer.

Thomas Madden was a Special Agent of the FBI who interviewed Koopmans at her apartment in Portage, Wisconsin, on March 29, 1983. He testified as follows:

I then indicated to Kathy I would like to talk to her about the delivery of marijuana to Inmate Doug Henry at the Federal Correctional Institute at Oxford. To which she responded, "I don't smoke marijuana." I then said to her that I was not here to talk to her about whether she smoked marijuana or not. I told her we had reported to us that on March 6 of this year that she went to F.C.I. Oxford and visited Douglas Henry and that subsequent to her visit approximately eight—I think I said eight bags or balloons of marijuana were removed from Doug Henry, and this was a violation of federal law. To which she responded, "I only did it once."

The testimony of these witnesses constitutes substantial evidence from which a jury could conclude beyond a reasonable doubt that the objects Henry was observed swallowing were the marijuana-filled balloons, that Henry obtained those balloons from Koopmans in the visiting room, and that Koopmans therefore introduced them into FCI Oxford. To be sure, Henry and Koopmans both denied these conclusions, but a rational jury could have disbelieved them. There was no testimony by a disinterested third party to corroborate Henry's alternative theory that he got the balloons from another inmate in the visiting room and not from Koopmans. A jury could have inferred that Henry was merely trying to shield Koopmans.

Koopmans suggests that Henry was seen eating potato chips. But Koopmans testified that the potato chips were on the table in front of them. Murdock saw Henry take the objects from Koopmans's pocket, an improbable place to keep potato chips, and his description of Henry's behavior in ingesting those objects fits the swallowing of balloons better than the eating of potato chips. It was just that peculiar behavior that aroused Murdock's suspicions.

Koopmans argues that when she entered the prison, she emptied her pockets, and their contents were examined. If she did not have the balloons in her pocket when she entered, she asks, how could Henry have removed them later? A rational jury could infer that the balloons were secreted on her person when she entered the prison and that she later transferred them to her pocket, most likely on a trip to the visitor's bathroom. There is clear testimony that visitors were not searched (beyond emptying their pockets and wallets and passing through a metal detector) when they entered the prison, that there were bathrooms for the use of visitors, and that Koopmans arrived at the prison at about 8:00 a.m., while the suspicious behavior was observed at about noon. Koopmans testified that she used the visitor's bathroom before noon.

Koopmans contends that in talking to Special Agent Madden she got confused and thought he was asking about her use of marijuana when she said, "I only did it once." But a jury could have disbelieved this and construed her statement as an admission of guilt.

Finally, Koopmans testified that she was in love with Henry. Being in love, of course, is not a violation of the law. But the jury could have inferred that her love for Henry made her willing to break the rules by bringing him marijuana.

### III

We find no reversible error in the convictions of Douglas Henry and Kathy Koopmans, and their convictions are

AFFIRMED.