**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert SALERNO, Defendant–Appellant.**

No. 95–3577.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 23, 1996.

Decided March 4, 1997.

Mitchell A. Mars (argued), David Buvinger, Office of the United States Attorney, Criminal Division, Chicago, IL, Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Terence P. Gillespie, Genson, Steinback, Gillespie & Martin, Chicago, IL, Alexander M. Salerno (argued), Berwyn, IL, for Defendant–Appellant.

Before WOOD, Jr., RIPPLE, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Robert Salerno was convicted under 18 U.S.C. § 1952B[1] for murder and conspiracy to commit murder for the purpose of maintaining or increasing his position in a racketeering enterprise. He challenges his conviction on four grounds: 1) that the government violated the Speedy Trial Act by allowing 17 months to elapse between the conclusion of Salerno's first trial and the announcement of its intent to retry Salerno; 2) that the district court erred in permitting the government to present extensive evidence of other crimes to show the existence of, and defendant's participation in, an enterprise; 3) that the admission of evidence of other crimes for which Salerno had been acquitted violated the issue preclusion component of the Double Jeopardy Clause; and 4) that the district court erred in admitting into evidence the government's scale model of the crime scene, which the jury was also permitted to examine during its deliberations. Because we find these claims to be without merit, we affirm the decision of the district court.

## I. HISTORY

This case involves the murder of Hal Smith, allegedly by the defendant, Robert Salerno, and his cohorts Rocco Infelise, Louis Marino, and Robert Bellavia. All four men were members of the Ferriola Street Crew— a unit of Chicago's organized crime establishment, often referred to as the "Outfit." The Chicago Outfit operates through "street crews," and the Ferriola Street Crew (named after Joseph Ferriola, the boss of the crew from 1979 to 1989) engaged in a number of criminal activities including the collection of protection money (or "street tax") from bookmakers, houses of prostitution, and adult theaters. Infelise became the boss of the Ferriola Street Crew upon Ferriola's death in 1989.

On February 10, 1985, Smith's stabbed, strangled, and tortured body was found in the trunk of his own car. Smith ran a lucrative independent bookmaking operation in Lake County, Illinois. Beginning around 1981, Smith was aware that Marino and Salvatore DeLaurentis—another member of the Ferriola Street Crew—were attempting either to collect street taxes from independent bookmakers or to force them to become partners with the Ferriola crew. After initially resisting these efforts, Smith and his two bookmaking partners began paying DeLaurentis $3,000 per month in street tax in 1983.

In late February or early March 1984, DeLaurentis arranged to meet Smith and one of his phone clerks at an Arlington Heights restaurant. At the meeting, DeLaurentis asked Smith to pay $6,000 per month in street tax. Smith offered to pay $3,000 and then $3,500, but DeLaurentis insisted upon the $6,000. At that point, Smith and DeLaurentis had a loud argument over who had more money and power, and they began throwing money at each other. Smith then ordered DeLaurentis to leave before he kicked his "olive oil smelling ass" back to Sicily. DeLaurentis retorted that Smith would be "trunk music."

In the spring of 1984, Infelise asked William Jahoda, an Outfit bookmaker, where Smith lived so that the street crew could collect the tax. Throughout the summer of 1984, Salerno, Infelise, Marino, and Bellavia used Jahoda's Long Grove, Illinois house as a base for their "stalking" operation of Smith in an attempt to learn his whereabouts and identify his car. On or about February 4, 1985, Infelise ordered Jahoda to bring Smith to Jahoda's house. Jahoda arranged to meet Smith at a tavern on February 7 and informed Infelise of the meeting.

---

1. In 1988, Congress renumbered this section to 18 U.S.C. § 1959.

On the afternoon of February 7, 1985, Salerno, Infelise, Marino, and Bellavia came to Jahoda's house. Infelise instructed Jahoda to bring Smith back to Jahoda's house in Smith's car. He also wanted Jahoda to remain outside and let Smith enter the house alone through the kitchen. That night, Jahoda met Smith and brought him back to his house. Smith entered the house by himself while Jahoda pretended to go to the mailbox. Jahoda saw Smith through the kitchen door and windows, and he saw Salerno come up behind Smith. Jahoda waited in the garage until Infelise came outside looking for Smith's car. Infelise, however, returned to the kitchen to get Smith's car keys. At that time, Jahoda saw Smith lying on the kitchen floor but still conscious, surrounded by Bellavia, Marino, and Salerno. Marino removed Smith's car keys from Smith's coat pocket and gave them to Infelise. Infelise then drove Jahoda back to the tavern and instructed him to burn his clothes.

Everybody was gone when Jahoda returned home later that evening. Jahoda noticed that part of the kitchen floor had been mopped, and he found a brown bag, a plastic bag for vinyl twine, and a hardware store receipt. He also received a phone call from Infelise who asked Jahoda to look for a cigar and some glasses that Marino thought he had left behind. Jahoda did not find these items; the Arlington Police, however, later recovered both the cigar and glasses from Smith's car. In the years after the murder, Infelise, Bellavia, and Salerno made statements to Jahoda regarding the "stalk" and murder of Smith. Little did they know, however, that Jahoda became an informant for the government in April 1989.

A grand jury returned a multi-count superseding indictment against twenty individuals, including Salerno, charging them with a variety of crimes including RICO conspiracy. Salerno was also named in three RICO predicate acts and two substantive counts. Count 8 charged Salerno of conspiring with Infelise, DeLaurentis, Bellavia, and Marino to murder Smith in order to maintain or increase their

positions in a racketeering enterprise. Count 9 charged Salerno, Infelise, Bellavia, and Marino with the actual murder of Smith, again for the purpose of maintaining or enhancing their positions in the enterprise.

The government's case against these defendants proceeded to trial, and on March 10, 1992, the jury delivered its verdict. The jury found Salerno not guilty of RICO conspiracy, but it convicted Infelise, DeLaurentis, Bellavia, and Marino on the RICO conspiracy count, as well as other counts. *See generally, United States v. DiDomenico*, 78 F.3d 294 (7th Cir.) (affirming convictions) *certs. denied*, —— U.S. ——, 117 S.Ct. 507, 136 L.Ed.2d 398 (1996). The jury, however, could not reach a verdict on Counts 8 or 9 as to Salerno, Infelise, Bellavia, and Marino.[2] Seventeen months later, the government announced its intention to retry only Salerno on Counts 8 and 9. In the second trial, a jury found Salerno guilty on both counts.

## II. ANALYSIS

### A. *Speedy Trial Act*

■ The first issue on appeal is whether the district court erred in finding no violation of the Speedy Trial Act despite the fact that 17 months elapsed between the first jury's verdict and the government's announcement that it would retry Salerno on Counts 8 and 9. We review a district court's interpretation of the Speedy Trial Act *de novo* and its factual findings for clear error. *United States v. Wimberly*, 60 F.3d 281, 284 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 744, 133 L.Ed.2d 693 (1996).

On March 10, 1992, the jury in the first trial returned a partial verdict against the five defendants, including Salerno. Although four defendants—*i.e.*, Infelise, Marino, DeLaurentis, and Bellavia—were found guilty on the RICO conspiracy count, Salerno was acquitted of this charge. The jury, however, failed to reach a verdict for Infelise, Marino, Bellavia, and Salerno on Counts 8 and 9 of the indictment, which charged them with conspiring to murder and the actual murder

---

**2.** The jury found DeLaurentis guilty on Count 8, but the district court vacated this verdict and declared a mistrial on December 30, 1992.

of Smith in order to maintain or increase their positions in a racketeering enterprise. Thus, these defendants remained subject to retrial on Counts 8 and 9.[3]

After the first trial, the district court endured an onslaught of complex post-trial and sentencing motions from the defendants and the government. The district court later described the post-trial proceedings as "remarkable for both the breadth and complexity of the issues presented," noting that it "issued more than a dozen separate opinions, totaling more than 400 pages." Memorandum Opinion and Order, *United States v. Salerno,* No. 90 CR 875, at 2, 1994 WL 30955 (N.D.Ill. Jan. 26, 1994) (denying Salerno's motion to dismiss the indictment based on the Speedy Trial Act). After the resolution of the post-trial motions and sentencing proceedings, the government pronounced that it would retry only Salerno on Counts 8 and 9. At that point, Salerno complained that the government violated the Speedy Trial Act by not beginning his retrial within the 70–day statutory period. *See* 18 U.S.C. § 3161(e). The district court denied Salerno's motion to dismiss the indictment, finding the entire period from March 10, 1992 to August 24, 1993 to be excludable under 18 U.S.C. §§ 3161(h)(1) and (h)(7).[4]

Section 3161(e) of the Speedy Trial Act provides, in part, that when a "defendant is to be tried again following a declaration by the trial judge of a mistrial ... the trial shall commence within seventy days from the date the action occasioning the retrial becomes final." 18 U.S.C. § 3161(e). This section further provides, however, that the "periods of delay enumerated in Section 3161(h) are excluded in computing the time limitations specified in this section." *Id.*

It is undisputed that 70 days passed between the date of the verdict in the first trial ("the date the action occasioning the trial

bec[ame] final") and the government's statement of its intention to retry Salerno on Counts 8 and 9. Thus, we must determine whether the district court correctly decided that the 17–month "post-trial" period was properly excludable for Speedy Trial Act purposes.

Because this was a multiple-defendant prosecution, we first turn to § 3161(h)(7) to guide our analysis. That section provides an exclusion for a "reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. § 3161(h)(7). We have repeatedly held that under this section, "the excludable delay of one defendant may be ascribed to all codefendants in the same case, absent severance." *United States v. Tanner,* 941 F.2d 574, 580 (7th Cir.1991) (quoting *United States v. Dennis,* 737 F.2d 617, 620 (7th Cir.1984)). In this case, Salerno and his four codefendants were all subject to retrial on Counts 8 or 9, and Salerno neither sought nor was granted severance from his codefendants. Therefore, any reasonable period of time that could be excluded as to Infelise, Marino, DeLaurentis, or Bellavia could similarly be excluded as to Salerno.

We agree with the district court that the entire period from March 10, 1992 to August 24, 1993 was excludable as to Salerno's codefendants. Section 3161(h)(1) generally provides for the exclusion of a "period of delay resulting from other proceedings concerning the defendant." 18 U.S.C. § 3161(h)(1). That section also supplies a nonexhaustive list of proceedings in which a period of delay "shall be excluded" in computing the time within which the trial must commence. *See United States v. Garrett,* 720 F.2d 705, 709 (D.C.Cir.1983) (noting that the listed proceedings in § 3161(h)(1)(A)–(J) are "merely illustrative and not intended to be exhaus-

---

**3.** As noted above, DeLaurentis was also subject to retrial on Count 8 after the district court vacated the jury's guilty verdict as to that count.

**4.** The district court found that excludable delay based on § 3161(h)(1)(F), which excludes time for the prompt disposition of pretrial motions, began on August 24, 1993—the day the government announced its intention to retry Salerno.

The defendant does not complain about the exclusion of time from this point (August 24, 1993) up to the beginning of the trial (February 7, 1995). Thus, the only period at issue here is the 17–month period from the date of the partial verdict in Salerno's first trial (March 10, 1992) to the announcement of Salerno's retrial (August 24, 1993).

tive"). Section 3161(h)(1) exclusions "operate automatically" to deduct time from the Speedy Trial Act clock, *United States v. Montoya*, 827 F.2d 143, 151 (7th Cir.1987), and courts have discretion to determine "the nature of *those proceedings* which fall within the 'other proceedings' language" of that section, *United States v. Lopez–Espindola*, 632 F.2d 107, 110 (9th Cir.1980).

The proceedings in this case—post-trial and sentencing motions—are not expressly cited as excludable under § 3161(h)(1). Nonetheless, the district court properly found that these post-trial matters are "other proceedings" within the general language of § 3161(h)(1). In that regard, courts have adopted a broad interpretation of "other proceedings," *Garrett*, 720 F.2d at 710, and found excludable delay in the following instances: time spent in a defendant's plea bargaining negotiations, *Montoya*, 827 F.2d at 150; time spent litigating a codefendant's bond violation and subsequent bail hearing, *Garrett*, 720 F.2d at 709–10; and time spent by an appellant in state custody due to probation revocation proceedings, *Lopez–Espindola*, 632 F.2d at 110.

■ In this case, we similarly find that the time spent litigating post-trial motions and resolving sentencing disputes was excludable under § 3161(h)(1). The entire time between March 10, 1992 and August 24, 1993 was necessary to resolve several complex, post-trial issues including defendants' motions for new trials, DeLaurentis's motion to vacate his conviction, defendants' joint motion to dismiss based on the government's alleged taping of attorney-client conversations at the Metropolitan Correctional Center (MCC), defendants' motions to interview jurors with regard to written communications received by the court from a juror, Infelise's supplemental motion for a new trial, defendants' motion for the government to release its MCC investigative report, and defendants' motion to reconsider the court's prior denial of an evidentiary hearing. During this entire time, the court was also forced to adjudicate several sentencing issues regarding Salerno's codefendants, including extensive challenges to defendants' Presentence Investigation Reports (PSIs), the government's motions for upward departure, and the defendants' objections to those motions.

Without pointing to any specific dates or providing any calculation of nonexcludable days of delay, Salerno simply claims that the period from January 22, 1993 (the denial of Infelise's Supplemental Motion for a New Trial) to August 17, 1993 (the "finalization" of the sentencing process) was a "period of inaction" in excess of the 70–day Speedy Trial Act requirement. After our own review of the docket we understand why the defendant failed to calculate the exact number of nonexcludable days during this alleged 207–day "period of inactivity"—there are simply too many overlapping post-trial and sentencing motions during this time period for anyone to ferret out over 70 days of unexcludable delay.[5] As such, we find no Speedy Trial Act violation.

5. For example, by January 22, 1993, the court and the government were still waiting for some defendants' responses to the government's motion for upward departure from the sentencing guidelines, which it had filed on September 16, 1992. Our review of the docket shows that in the several months after the government filed its motion, several defendants objected to the motion, and the government subsequently responded to these objections. On March 5, 1993, the government responded to DeLaurentis's objections. Thus, as of March 5, 1993, there are zero days of unexcludable delay that count towards the Speedy Trial clock.

Meanwhile, the government and DeLaurentis were litigating DeLaurentis's motion for a mistrial, thereby postponing the litigation regarding his PSI. The PSIs for all the defendants were completed in late August 1992, and the other defendants had been litigating their objections to their PSIs in the subsequent months. On April 13, 1993, DeLaurentis finally filed his objections to his PSI; the government responded on May 10, 1993, and DeLaurentis replied on June 21, 1993. Considering the overlap between the litigation involving the upward departure motions and the objections to DeLaurentis's PSI, there are still zero days of unexcludable delay as of June 21, 1993.

On July 15 and 16, 1993, the district court issued lengthy opinions ruling on defendants' various objections. Then on July 22, 1993, the government filed a separate motion for upward departure regarding DeLaurentis; DeLaurentis responded, and the government filed its reply on August 12, 1993. Thus, the entire time from July 22, 1993 to August 12, 1993 is excludable. Adding the 31 days from June 21 to July 22, and the 5 days from August 12 to August 17, we are left with only 36 days of unexcludable delay.

We reject defendant's argument that the district court erred in relying upon the "general and introductory" language of § 3161(h)(1) rather than the more specific requirements of § 3161(h)(1)(J) ("subsection (J)"). Subsection (J) excludes "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." 18 U.S.C. § 3161(h)(1)(J). Our determination that delays from the post-trial and sentencing proceedings are excludable under § 3161(h)(1)'s general language does not offend the cannon of statutory interpretation that a more specific statutory provision takes precedence over a more general provision. Subsection (J) is not a catch-all provision that encompasses every single proceeding not covered in the other subsections of § 3161(h)(1). Rather, subsection (J) automatically provides a 30–day exclusion for periods covering any proceedings once they are *actually taken under advisement* by the district court, i.e., after the court has all of the necessary materials and has conducted the appropriate hearings to decide the issue. *See Henderson v. United States,* 476 U.S. 321, 328–29, 106 S.Ct. 1871, 1875–76, 90 L.Ed.2d 299 (1986) (finding that § 3161(h)(1)(J) "allows exclusion of up to 30 days while the district court has a motion 'under advisement,' *i.e.,* 30 days from the time the court receives all the papers it reasonably expects").

Moreover, in this circuit we have further determined that subsection (J)'s 30–day requirement cannot limit subsection (F), which excludes "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(F). In that regard, we have reasoned that the Speedy Trial Act cannot compel a district court to decide numerous pretrial motions "within a short, fixed period of time," and thus have held that "in a case of multiple pretrial motions the limitation is not 30 days, but reasonable

This example (which did not even consider the several other pending motions or subtract the 30 days for the time that the court actually took the motions under advisement) thus demonstrates that the period from January 22 to August 17,

promptness." *United States v. Tibboel,* 753 F.2d 608, 612 (7th Cir.1985) (finding 42 days reasonable to consider 7 pretrial motions); *see United States v. Cheek,* 3 F.3d 1057, 1066–67 (7th Cir.1993) (finding 50–day delay reasonable for adjudicating 24 pretrial motions); *United States v. Latham,* 754 F.2d 747, 753 (7th Cir.1985) (finding 68 days reasonable to consider 8 pretrial motions).

Finally, as we noted above, § 3161(h)(1) expressly states that the provided list of proceedings is not exclusive. Thus, defendant's reading of the statute would render useless Congress's express determination that delays resulting from proceedings not detailed under § 3161(h)(1) could nonetheless be excluded for Speedy Trial Act purposes.

▬ Because the time spent litigating post-trial motions and sentencing issues was excludable against Salerno's codefendants, we must now determine whether that 17–month delay was reasonable under § 3161(h)(7). The facts of each particular case determine the reasonableness of the delay. *See Tanner,* 941 F.2d at 580; *Dennis,* 737 F.2d at 621. Considering § 3161(h)(7)'s preference for the judicial efficiency of joint trials, *see Dennis,* 737 F.2d at 621, as well as the magnitude and complexity of the issues involved in the post-trial and sentencing proceedings of this case, we easily find that the delay here was reasonable. All five defendants were subject to retrial on Counts 8 or 9 for their joint participation in the murder of Hal Smith, and at no point did Salerno move for severance. *See id.* The mere fact that the government ultimately chose (*after* the disposition of the post-trial and sentencing issues) to retry only Salerno on Counts 8 and 9 does not run counter to our reasoning. Moreover, our review of the record reveals that the district court handled the deluge of post-trial motions and sentencing objections in a commendable manner. Thus, we agree that the 17–month delay needed to adjudicate the post-trial motions and sentencing issues was reasonable.

1993 was anything but a "period of inaction," and that the actions of the government and the district court were well within the confines of the 70–day limit of the Speedy Trial Act.

We also find that defendant was not substantially prejudiced by the delay. The mere passage of time, without more, is not dispositive. *See Barker v. Wingo,* 407 U.S. 514, 532, 534, 92 S.Ct. 2182, 2193, 2194, 33 L.Ed.2d 101 (1972); *Dennis,* 737 F.2d at 621 (finding that the 144–day delay before defendant's trial was not "presumptively prejudicial" under *Barker v. Wingo*); *cf. Doggett v. United States,* 505 U.S. 647, 655, 112 S.Ct. 2686, 2692–93, 120 L.Ed.2d 520 (1992). Defendant claims that the delay improperly permitted the government to hone its trial strategies and perfect its evidence. However, " '[p]rejudice' is not caused by allowing the Government properly to strengthen its case, but rather by delays intended to hamper defendant's ability to present his defense." *United States v. Tedesco,* 726 F.2d 1216, 1221 (7th Cir.1984). Defendant has provided us with no persuasive evidence demonstrating that he was somehow less able to present an adequate defense due to the passage of time. Finally, defendant cannot convincingly claim that he was prejudiced by the "unresolved criminal charges looming over his head." He was neither incarcerated during the 17-month period, nor did he seek to modify his bond conditions during that time. Considering all of these factors, we find the defendant's Speedy Trial Act claim to be without merit.

## B. Admission of the "Enterprise" Evidence

Salerno next argues that the district court improperly allowed the government to present evidence of other crimes allegedly committed by him in order to prove the "enterprise" elements of the crimes charged in the indictment. We review evidentiary determinations for abuse of discretion, giving "special deference" to the discretion of the district court. *United States v. Stephens,* 46 F.3d 587, 597 (7th Cir.1995).

At Salerno's second trial, the government sought to introduce evidence of prior crimes allegedly committed by Salerno and others in order to establish the existence of a racketeering enterprise as required by § 1952B. In particular, this evidence revealed defendant's prior participation in demanding and collecting street taxes on behalf of the Ferriola Street Crew. Salerno objected to the admission of this testimony, some of which was not offered by the government at the first trial, arguing that it was not in furtherance of the charged conspiracy, that it concerned uncharged acts, and that its probative value was substantially outweighed by its unfair prejudice. The district court excluded the testimony of one witness (Robert Cooley), finding that the danger of its unfair prejudice substantially outweighed its probative value; the court, however, permitted the government to introduce the testimony of the other witnesses (David Kopulos, Joel Ross, William Jahoda, Richard Mara, Carmen Migliore, and George Boulahanis), finding their testimony relevant to establish the existence of, and Salerno's participation in, the charged enterprise. We find that the district court did not abuse its discretion in permitting the government to introduce this evidence.

In order to convict Salerno for the charged crimes the government was required to prove, beyond a reasonable doubt, the existence of an enterprise. Because enterprise was an essential element of the crimes charged, the proffered evidence cannot properly be characterized as "other crimes" evidence, and thus, Federal Rule of Evidence 404(b) does not apply. *See United States v. Blyden,* 964 F.2d 1375, 1378 (3d Cir.1992); *United States v. Towne,* 870 F.2d 880, 886 (2d Cir.1989); *United States v. Neapolitan,* 791 F.2d 489, 506 (7th Cir.1986); *see also United States v. Jackson,* 33 F.3d 866, 873 (7th Cir.1994) (finding Rule 404(b) inapplicable because defendant's failure to file tax returns was "intricately connected" with the charged conspiracy to impede and obstruct the IRS). We must, however, still address defendant's argument that the proffered evidence was irrelevant and unfairly prejudicial because it did not prove, nor was it necessary to prove, the charged enterprise.

As defined under 18 U.S.C. § 1952B, an enterprise "includes ... any union or group of individuals associated in fact although not a legal entity...." 18 U.S.C. § 1952B(b)(2) (1984) (renumbered 18 U.S.C. § 1959(b)(2)). The Supreme Court has characterized an "association-in-fact enterprise," as "a group

of persons associated together for a common purpose of engaging in a course of conduct," and "an entity separate and apart from the pattern of activity in which it engages." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2529, 69 L.Ed.2d 246 (1981) (interpreting "enterprise" under RICO's definition, 18 U.S.C. § 1961(4)); *see United States v. Rogers*, 89 F.3d 1326, 1335 (7th Cir.) (finding that § 1959(b)(2)'s [sec. 1952B(b)(2)'s] definition of "enterprise" is the same as under RICO's definition at § 1961(4)), *cert. denied*, —— U.S. ——, 117 S.Ct. 495, 136 L.Ed.2d 387 (1996); *United States v. Concepcion*, 983 F.2d 369, 380 (2d Cir.1992) (same). In that regard, the Court noted that a party proves enterprise through "evidence of an ongoing organization, formal or informal, and by evidence that the various associates [of the organization] function as a continuing unit." *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528.

Although the "existence of an enterprise at all times remains a separate element which must be proved by the Government," it is also firmly established that the "proof used to establish these separate elements [of 'enterprise' and 'pattern of racketeering activity'] may in particular cases coalesce." *Id.*; *see Rogers*, 89 F.3d at 1336–37; *United States v. Kragness*, 830 F.2d 842, 856 n. 11 (8th Cir.1987); *United States v. Mazzei*, 700 F.2d 85, 89 (2d Cir.1983). This is such a case. It is difficult to comprehend how one could prove the existence of an enterprise comprised of "a group of individuals associated in fact," and organized solely for the purpose of committing crimes, without presenting evidence of the crimes that detail the structure, common purpose, and continuity of the charged enterprise. Thus, we have allowed the government to use uncharged criminal acts in a RICO prosecution to prove the nature of an enterprise and the defendant's participation in it. *See, e.g., Neapolitan*, 791 F.2d at 501, 506.

The indictment in this case defined the enterprise as "The Joseph Ferriola Street Crew"—an "association in fact" of seventeen named individuals, as well as others known and unknown. The indictment charged that the enterprise operated from 1974 through the date of the indictment, and that it engaged in multiple racketeering acts including murder, extortion, illegal wagering, loansharking, and bribery.

Salerno primarily challenges the witness testimony that revealed his participation in demanding and collecting street taxes, and the witnesses' belief that Salerno was acting on behalf of the Ferriola Street Crew in these instances. Such evidence was clearly probative of Salerno's connection to the enterprise and the enterprise's need to murder Hal Smith for refusing to pay the street tax.

Defendant complains that some of this testimony was irrelevant in demonstrating the charged enterprise because it detailed his extortionate activities with others not explicitly named in the indictment as members of the enterprise. This argument, however, overlooks the fact that the indictment named as members of the enterprise seventeen individuals, as well as others "known and unknown."

Moreover, even though the government could, and apparently did, provide other evidence of the enterprise's structure via surveillance witnesses and undercover tape recordings, these sources of evidence make no less relevant the live testimony of people previously involved in extortions by Salerno and other members of the Ferriola Street Crew. In particular, the challenged testimony provided evidence of the leadership within the enterprise, the scope of the enterprise, the specialized functions of various crew members, the crew's method of collecting the street tax, the crew's desire to tax independent bookmakers, and perhaps most importantly, Salerno's actual participation in enterprise activities. Considering the experienced district court's explicit Rule 403 analysis of this evidence, we easily find that the court did not abuse its discretion in admitting the evidence.[6]

---

6. We also reject defendant's untimely argument that these prior extortions were "stale criminal acts, unconnected to the specific time-frame charged." Contrary to defendant's assertions, the relevant time frame was not between the fall of 1984 and February 7, 1985. The indictment specifically charged that the enterprise (an essential element of the crimes) began in 1974 and

Salerno's argument that this enterprise evidence was irrelevant because he did not contest the existence of an enterprise is without consequence. Defendant offered no stipulation concerning the enterprise element, see *United States v. Brown*, 34 F.3d 569, 573 (7th Cir.1994), and his lawyer's pretrial statement that he would not argue at trial that Salerno did not know other enterprise members is hardly a concession that the charged enterprise existed.

■ We similarly find without merit defendant's argument that reversal is warranted because the jury instructions did not limit the jury's consideration of this challenged evidence to the enterprise issue. Although defendant objected to the admission of the enterprise evidence, he never requested a limiting instruction directing the jury to consider it only in regard to proving the charged "enterprise" and not towards proving the charged "racketeering activity." Before the Supreme Court's decision in *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), we had typically reviewed a district court's failure to provide an unrequested jury instruction for plain error. See *United States v. Maloney*, 71 F.3d 645, 663 (7th Cir.1995) (discussing our cases before and after *Olano*), cert. denied, — U.S. ——, 117 S.Ct. 295, 136 L.Ed.2d 214 (1996); *United States v. Liefer*, 778 F.2d 1236, 1243–44 (7th Cir.1985). In this case, however, defendant was well aware of the potential need for such a limiting instruction. Thus, his lack of a request for such an instruction coupled with his affirmative acceptance of the court's final jury instructions demonstrates that he intentionally relinquished his known right to have the jury consider the extortion evidence for a limited purpose, see *Olano*, 507 U.S. at 732–34, 113 S.Ct. at 1777, and thus amounts to waiver of the issue. See *United States v. Espino*, 32 F.3d 253, 258–59 (7th Cir.1994); *United States v. Lakich*, 23 F.3d 1203, 1207–08 (7th Cir.1994); see also Fed.R.Crim.P. 30.[7]

■ However, even if defendant's failure to request such an instruction amounted to forfeiture of the issue rather than waiver, see *Olano*, 507 U.S. at 732–34, 113 S.Ct. at 1777, he has still not shown plain error. Whether defendant's counsel neglected to request such an instruction as a tactical move, or simply as an oversight, he cannot convincingly argue that the district court erred in failing to provide a limiting instruction *sua sponte*. See *United States v. Gregory*, 74 F.3d 819, 822 (7th Cir.1996); *Liefer*, 778 F.2d at 1243–44 & n. 4. Such a cautionary instruction was simply not required in this case where the challenged evidence tended to prove defendant's participation in the charged enterprise, see *United States v. Perholtz*, 842 F.2d 343, 359 (D.C.Cir.1988) (ruling that no cautionary instruction was necessary where the challenged evidence tended to prove the continuity of an association-in-fact enterprise), and where the court had determined that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

## C. Issue Preclusion

■ Salerno next argues that the government violated the issue preclusion component of the Double Jeopardy Clause by admitting evidence of offenses for which he had been previously acquitted. We use a *de novo* standard of review for issue preclusion determinations. *United States v. Bailin*, 977 F.2d 270, 281 (7th Cir.1992); *United States v. Gentile*, 816 F.2d 1157, 1161 (7th Cir.1987).

Specifically, defendant claims that the district court violated the issue preclusion (or collateral estoppel) component of the Double Jeopardy Clause by allowing the government to present evidence of the alleged extortions of William Jahoda and David Kopulos by the Ferriola Street Crew. In a 1985 federal trial, a jury found Salerno not guilty of extorting Kopulos. In the first trial of this case, a jury acquitted Salerno of RICO con-

---

continued up to 1990 (August 19, 1990—the date of the original indictment). All of the "stale" crime evidence fell within this period.

**7.** Rule 30 provides, in pertinent part: "No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection."

spiracy, and in doing so, it expressly found that Salerno did not agree to the charged intimidation or extortion of Jahoda. The district court denied defendant's pretrial motion to preclude this "extortion" evidence, finding it relevant "to show the existence of, and defendant's membership in, the conspiracy."

Issue preclusion in the criminal context means that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970); *accord Bailin,* 977 F.2d at 274. In *Bailin,* we listed the three procedural rules that govern the application of issue preclusion in criminal cases. First, courts should not apply the collateral estoppel rules in a hypertechnical manner, but rather should examine the pleadings, evidence, charge, and other relevant matter to determine whether a rational jury could have based its verdict on an issue other than the one the defendant seeks to foreclose from consideration. *Bailin,* 977 F.2d at 280; *see Ashe,* 397 U.S. at 443, 90 S.Ct. at 1194. Second, issue preclusion only applies when a relevant issue in a subsequent prosecution is an "ultimate issue," *i.e.,* an issue that must be proven beyond a reasonable doubt. *Bailin,* 977 F.2d at 280; *see Dowling v. United States,* 493 U.S. 342, 348–51, 110 S.Ct. 668, 672–74, 107 L.Ed.2d 708 (1990). Third, the defendant bears the burden of proving that this ultimate issue was necessarily determined by the prior jury. *Bailin,* 977 F.2d at 280; *see Dowling,* 493 U.S. at 350–51, 110 S.Ct. at 673–74.

In this case, Salerno cannot demonstrate that extortion was an "ultimate issue" at his retrial, or that the prior acquittals necessarily determined that the charged enterprise or its racketeering activity did not exist. While defendant properly asserts that the juries in the two prior trials failed to find him guilty of extorting money from Kopulos or Jahoda, that question is completely irrelevant in this trial. At Salerno's retrial, the government needed to prove that the charged enterprise existed, that defendant was a member of it, and that the enterprise

engaged in racketeering activity (in addition to proving the various elements for murder and conspiracy to commit murder). The government, however, was not required to prove that Salerno ever extorted Kopulos and Jahoda. As such, these were not "ultimate issues" for issue preclusion purposes.

Moreover, defendant cannot show that the existence of the enterprise, the defendant's membership in the enterprise, or the fact that the enterprise engaged in racketeering activity were necessarily precluded by Salerno's prior acquittals on the two extortion charges. In fact, we previously found on interlocutory appeal that an entirely plausible reading of the verdict from Salerno's first trial was that the "jury believed that Salerno was associated with the enterprise (or never reached that question in its deliberations) but could not agree on whether he participated in the murder." *United States v. Salerno,* 1994 WL 399196, No. 94–1331, at *1 (7th Cir. August 1, 1994) (unpublished order). In this regard, one can easily envision a situation where Salerno did not extort Kopulos or Jahoda, yet still find that the Ferriola Street Crew existed, that Salerno was a member of the Crew, and that the Crew engaged in racketeering activity.

The crux of defendant's argument rests on the fact that jury was permitted to consider the evidence of these acquitted extortions not only as proof of enterprise, but also as proof of racketeering activity. The final instructions given to the jury provided that the government was not required to show that Salerno "personally perform[ed] or agree[d] to personally participate in any racketeering activity committed by the enterprise" in order to prove that the enterprise engaged in racketeering activity. (Jury Instruction, No. 39.) That same jury instruction, however, stated that "[o]ne way the government may establish that a defendant knew racketeering activity would be committed by the enterprise is by proving the defendant committed racketeering activity on behalf of the enterprise." *Id.* Defendant thus argues that this instruction permitted the jury to use the two extortion acquittals as evidence of racketeering activity.

Defendant's argument, however, fails for three reasons. First, the jury was never required to find that Salerno extorted anybody; the government needed to show only that the enterprise engaged in racketeering activity. Thus, the issue of extortion was never an "ultimate issue" at Salerno's retrial. Second, defendant has not met his burden of demonstrating that the jury necessarily used the evidence from two prior extortions to satisfy the racketeering activity element. The government presented abundant evidence—aside from the acquitted extortions—detailing the enterprise's racketeering activity and Salerno's knowledge of and participation in this activity. This case is unlike a RICO prosecution where the jury's need to find explicitly specific predicate acts could more easily demonstrate that a prior judgment of acquittal had necessarily precluded an issue from the jury's consideration. *See, e.g., Bailin,* 977 F.2d at 282–83.

Third, defendant neither requested a limiting jury instruction, nor objected to the final instructions submitted to the jury by the court; thus, he cannot claim such an error here. Defendant failed to request that the district court instruct the jury of the limited nature of the extortion evidence when it was first introduced by the government, he failed to offer a proposed instruction regarding the extortion evidence at the end of the case, and he affirmatively agreed to the set of jury instructions on this issue that was ultimately given by the district court. Based on these actions, it appears that defendant intentionally relinquished his known right to have the jury consider the extortion acquittals for only a limited purpose, and thus has waived any such argument on appeal. *See Olano,* 507 U.S. at 730–34, 113 S.Ct. at 1776; *Espino,* 32 F.3d at 259; *Lakich,* 23 F.3d at 1207–08.[8]

Even under plain error review, Salerno would not be entitled to relief. The district court committed no error (plain or otherwise) either in admitting the Kopulos and Jahoda extortion testimony, or in failing to instruct the jury regarding the limited purpose for which the testimony was offered. Salerno's prior acquittals did not *necessarily* preclude this jury's finding that the Ferriola Street Crew enterprise existed and engaged in racketeering activity. As such, we reject defendant's issue preclusion claim.

### D. Admission of the Scale Model of the Crime Scene

▇▇▇▇ In his final argument, Salerno contends that the district court erroneously admitted into evidence a scale model of the crime scene, which the jury was permitted to examine during its deliberations. We review a district court's determination regarding the admissibility of demonstrative evidence, as well as its decision to send material to the jury room, for a clear abuse of discretion. *United States v. Hofer,* 995 F.2d 746, 748 (7th Cir.1993); *United States v. Burrell,* 963 F.2d 976, 982 (7th Cir.1992). Determinations regarding Federal Rule of Criminal Procedure 16 are "committed to the sound discretion of the district court, and we will reverse only for abuse of discretion prejudicial to the substantial rights of the defendant." *United States v. D'Antoni,* 856 F.2d 975, 984 (7th Cir.1988) (quoting *United States v. Koopmans,* 757 F.2d 901, 906 (7th Cir.1985)).

At Salerno's second trial, the government introduced into evidence a scale model of the crime scene (Jahoda's house), which depicted part of the house, the driveway, the individuals involved in the crime, and the victim's car. Before the scale model was finished, the government informed the defendant of its intent to use the model. The model was

---

**8.** Defendant seemed to shift his argument in order to avoid the waiver problem. In his initial brief, defendant claimed that the district court erred by failing to limit the admission of the extortion evidence for a *particular* purpose—*i.e.,* as evidence of enterprise. After the government raised the waiver issue, however, defendant asserted in his reply brief that the court erred in admitting the extortion evidence for *any* purpose.

If we assume that defendant's argument is as he states in his reply brief—*i.e.,* that he objected to the *introduction* of the evidence, not to the court's failure to provide a limiting instruction—we find that he cannot now claim that the district court erred by failing to limit the scope of the extortion evidence. Defendant's assertion that "[i]t is questionable whether a limiting instruction would have done any good," (Appellant's Reply Br. at 16 n. 7), demonstrates that his decision not to request a limiting instruction may have been a tactical move, and thus, eases our finding of waiver.

completed shortly before the trial, and the government informed defendant of its completion. On the day of opening statements, the government offered defendant's lawyers the opportunity to review the model, but they refused.

One week later—the day the government intended to put Jahoda on the witness stand—the government presented defendant with a proposed stipulation regarding the creation of the scale model. An FBI Visual Information Specialist had built the model based on photographs, plat surveys, floorplans, and footprints. The proposed stipulation fueled defendant's discovery objections, which claimed that the government had not allowed him enough time to inspect the model, had failed to provide "expert" materials regarding the builder of the model (e.g., a curriculum vitae), and did not produce the information upon which the builder relied. Specifically, defendant complained that although he was aware of the model, he was unaware that the model would be used in an "expert" fashion. The district court overruled the objections, reasoning that the model was a demonstrative aid and thus, it was not the subject of expert testimony. The court also ordered the government to turn over the documents on which the model was built, which the government promptly provided later that day.

Due to some days off in the trial schedule, the government did not actually introduce the model into evidence for another week. At that point, the government used the model during Jahoda's testimony in order to help the eyewitness explain the movements of the individuals allegedly involved in Smith's murder on February 7, 1985. Because the parties never agreed to a stipulation regarding the creation and accuracy of the model, the model maker provided foundational testimony one week after the government first used the model with Jahoda.

Salerno first contends that he was prejudiced by the government's belated disclosure of the scale model, as well as the government's failure to disclose a written summary of the "expert" testimony of the model builder. Defendant asserts that these belated and non-disclosures violated Federal Rule of Criminal Procedure 16, thereby depriving him of the opportunity to investigate the model, to obtain his own expert witness, to make an informed plea decision, or to reformulate his trial strategy.

Rule 16 of the Federal Rules of Criminal Procedure provides that "[u]pon request of the defendant the government shall permit the defendant to inspect and copy or photograph ... tangible objects ... which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial." Fed. R.Crim.P. 16(a)(1)(C). It further states that at the defendant's request, the government must disclose "a written summary of [expert] testimony" that it intends to use. Fed. R.Crim.P. 16(a)(1)(E). "To succeed in obtaining a reversal on appeal" for a discovery violation, "a defendant must prove both an abuse of discretion and prejudice." *United States v. Alvarez*, 987 F.2d 77, 85 (1st Cir. 1993).

Initially, we note that it is doubtful that the government violated Rule 16. Before the trial began, the government apprised the defendant that it intended to use the scale model. Once the model was completed, the government afforded defendant ample opportunity (two full weeks) to inspect it before its introduction into evidence, which the drawn-out trial schedule readily reflects.[9]

Nor was it apparent that the government violated Rule 16(a)(1)(E) by failing to turn over a summary of expert testimony. From the record, it does not appear that the defendant ever requested any expert discovery material, as Rule 16 required him to do, until the fourth day of trial. On that day, the

9. Due to federal holidays and a judicial conference, trial was conducted on February 7–8, 13–16, 21–22, 27, and March 1, 1995. The government invited the defendant to examine the scale model on February 7, the day of opening statements. Upon receiving the government's proposed stipulation regarding the model on February 14, defendant first objected to its admission. That was also the first time that the defendant availed himself of the opportunity to inspect the model. The government first used the scale model in court on February 21.

court ruled that admission of the scale model did not require expert testimony; as such, there was no expert testimony for the government to summarize. In that regard, the district court did not err in determining that the model was demonstrative evidence that did not require the testimony of an expert. Although the model maker was a FBI Video Information Specialist who had testified as an expert in the past, his testimony in this trial was merely foundational. Moreover, the government promptly complied with any request for "expert" material that defendant may have made by turning over the floorplans, blueprints, and other materials used by the model maker on the very day those materials were requested by the defendant.

 Even if the government had violated Rule 16, defendant certainly has not demonstrated that he was substantially prejudiced by any belated disclosure of the scale model or the non-disclosure of any "expert" materials of the model maker. "Substantial prejudice exists when a defendant is unduly surprised and lacks an adequate opportunity to prepare a defense or if the mistake substantially influences the jury." *United States v. Camargo-Vergara,* 57 F.3d 993, 998–99 (11th Cir.1995). Defendant has failed to show such deficiencies here.

As shown above, defendant had at least two weeks after the government invited him to inspect the model, and one week after he actually examined the model, to obtain expert witnesses or otherwise alter his trial strategy. Additionally, Salerno never indicated how additional preparation time would have altered his strategy, nor does the record reflect any evidence that defendant sought out his own expert to examine the model. *See Koopmans,* 757 F.2d at 906. Along those lines, we note that defendant's counsel knew before trial that the government was going to use a scale model or "mock up" of the crime scene; thus, defendant could have retained an expert at that point in case such an expert was needed later in the trial. Moreover, the record does not suggest that defendant's cross-examination of either Jahoda or the model maker was impaired by any delays. *See United States v. Caudill,* 915 F.2d 294,

299–300 (7th Cir.1990); *Koopmans,* 757 F.2d at 906.

 Salerno next asserts that the district court abused its discretion in the way it allowed the government to use and publish the scale model. When the government first introduced the model, it sought to have the jury file past it. Defendant objected, complaining that this presentation was "overly dramatic" and prejudicial, analogizing it to mourners filing past a deceased person's casket. The court overruled defendant's objection and permitted jurors to file past the model on that occasion and at two more times during the trial.

Rule 611(a) of the Federal Rules of Evidence declares that the "court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and the presentation effective for the ascertainment of the truth...." Demonstrative aids are regularly used to clarify or illustrate testimony. *See, e.g., Roland v. Langlois,* 945 F.2d 956, 963 (7th Cir.1991) (admitting life-sized replica of amusement park ride into evidence); *United States v. Towns,* 913 F.2d 434, 445–46 (7th Cir.1990) (admitting ski mask and gun into evidence for demonstrative purpose of providing examples of the mask and gun used at a bank robbery).

The record in this case reveals that the district court was concerned about whether all of the jurors could view the model from their places in the jury box. After coming to the conclusion that several of the jurors would not be able see it, the court allowed the jurors to file past the exhibit. In doing so, however, the court also instructed the government that when the jurors walked by the model they could not elicit testimony from the witness, the witness had to return to the witness box, and the government agents and prosecutors could not stand near the model. The court clearly did not abuse its discretion in allowing the jury to file past the model of the crime scene. If anything, defendant's use of the model during the cross-examination of Jahoda—by having the witness stand next to the exhibit while speculating whether the model was accurate—

was more dramatic than the government's use of it.

■ Salerno's final argument is that he was prejudiced by the court's decision to let the scale model go to the jury room during its deliberation. Defendant claims that this crucial piece of demonstrative evidence took on an "air of infallibility" that improperly bolstered the eyewitness's (Jahoda's) credibility. He also argues that the model's presence during jury deliberations allowed the government's witness to "in effect accompan[y] the jury into the jury room." *United States v. Ware*, 247 F.2d 698, 700 (7th Cir. 1957).

■ "[A]s long as the district court is evenhanded in its evidentiary rulings, [it] has wide discretion in determining whether an exhibit will be allowed to go into the jury deliberation room." *Hofer*, 995 F.2d at 749 (citing *United States v. Samples*, 713 F.2d 298, 303 (7th Cir.1983)). In this case, nothing in the record suggests that the district court favored the government over the defendant in making its evidentiary determinations. Specifically, the court permitted some of defendant's arguably misleading photographs of the crime scene to go to the jury room along with the government's scale model. Moreover, defendant's lawyer thoroughly challenged the testimony of both Jahoda and the model maker on cross-examination. In particular, defense counsel placed a defendant's exhibit sticker on the model to illustrate the location of the eyewitness. Thus, defendant cannot argue that only the "government's voice" regarding the model was heard in the jury room.

■ Finally, the district court made an explicit Federal Rule of Evidence 403 determination regarding the admission of the model and its delivery to the jury room. We look upon a district court's Rule 403 balancing with a "special degree of deference." *United States v. Crockett*, 979 F.2d 1204, 1211 (7th Cir.1992). Although in some cases it may be better practice to exclude demonstrative evidence from the jury room in order to reduce the potential for unfair prejudice, *see Towns*, 913 F.2d at 446, in this case, the district court certainly did not abuse its dis-

cretion. *See United States v. Cox*, 633 F.2d 871, 874–75 (9th Cir.1980) (admitting "mockup bombs" into evidence for illustrative purposes and permitting them to go to the jury room).

For these reasons, we AFFIRM the defendant's conviction.