**UNITED STATES of America, Plaintiff,**

v.

**Jesse J. EVANS, Defendant.**

**No. 96 CR 436.**

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 7, 1997.

David S. Rosenbloom, Sean Martin, U.S. Attys. Office, Chicago, IL, for U.S.

Stanley L. Hill, James D. Tunick, Stanley L. Hill & Assoc., P.C., Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

On June 16, 1997, a jury convicted defendant Jesse Evans on all but one count of a 16 count indictment. Mr. Evans has filed various post-trial motions. The Government argues that all but one of them are untimely.

## I.

At the time the jury returned its verdict, Mr. Evans, through counsel, asked for "30 days" (Tr. 2832) to file post-trial motions. I granted the request. On July 9, 1997, Mr. Evans sought an extension of time until August 18, 1997 to file post-trial motions. The Government did not object. I granted the motion. Mr. Evans' motions were filed on August 18, 1997.

Fed.R.Crim.P. 29(c) provides that a motion for a judgment of acquittal must be brought within seven days of the time a jury is discharged "or within such further time as the court may fix during the 7–day period." Fed.R.Crim.P. 33 provides that a motion for a new trial on any ground other than newly discovered evidence "shall be made within 7 days after verdict ... or within such further time as the court may fix during the 7–day period." Rule 45(b), Fed .R.Crim.P. permits the court to extend time upon request with the exception that "the court may not extend the time for taking any action under Rules 29, 33 ..., except to the extent and under the conditions stated in them."

█ In *Carlisle v. U.S.*, 517 U.S. 416, 116 S.Ct. 1460, 134 L.Ed.2d 613 (1996), the United States Supreme Court held that these rules "are plain and unambiguous" and that they could not be extended or excused by a trial judge. *Id.* at ——, 116 S.Ct. at 1464. Although *Carlisle* did not specifically deal with the question raised by Mr. Evans' actions, namely, a second request for additional time to file his motions made after the granting of a timely motion for additional time to file motions, the Seventh Circuit has held that a district court lacks power to grant the second request for an extension of time, and has no power to decide the untimely filed post-trial motions on their merits. *U.S. v. Hocking*, 841 F.2d 735 (7th Cir.1988).

Mr. Evans argues that there is an exception permitting me to decide his motions on the ground that he was affirmatively misled by me and the government, because I mistakenly granted his July 9 motion for an extension of time to August 18 to file the motions and because the Government failed to object or to tell him about the rule. There is some doubt about the existence of such an exception given the Supreme Court's opinion in *Carlisle* that holds that equity does not permit an extension of the time limits set forth in the rules. 517 U.S. at ——, ——, 116 S.Ct. at 1468, 1469. However, a concurring opinion in *Carlisle,* in which three justices joined,[1] which referred to an example in which a trial judge misinformed a party that his new trial motion was made "in ample time" when it was shown that a party would have filed a notice of appeal on time but for the improperly granted extension of time, may leave such an opening based on principles of estoppel. Even so, it has been held that the exception applies "only where a party has performed an act which, if properly done, would postpone the deadline for filing his [motion] and has received *specific assurance* by a judicial officer that this act has been properly done." *Osterneck v. Ernst & Whinney,* 489 U.S. 169, 179, 109 S.Ct. 987, 993, 103 L.Ed.2d 146 (1989) (emphasis added). The Seventh Circuit has held that a minute order granting an extension of time "is not an act of affirmative representation by a judicial officer as contemplated by Osterneck." *Green v. Bisby,* 869 F.2d 1070, 1072 (7th Cir.1989). The court has reached the same conclusion regarding spoken orders. *Varhol v. National R.R. Passenger Corp.,* 909 F.2d 1557, 1563 (7th Cir.1990) (*en banc* ).[2]

Mr. Evans says I "affirmatively misled" him into filing late by orally stating at a hearing on July 9 that I would grant his request for an extension of time "because the

---

**1.** Since Justice Stevens and Justice Kennedy dissented from the decision, it seems probable that they would join in reading this exception into the rules.

**2.** An evenly decided *en banc* Seventh Circuit concluded in *Varhol* that a trial judge's finding of excusable neglect for failing to timely file a no-

tice of appeal under Rule 4(b), Fed.R.App .P., which provides for an extension to file for "excusable neglect," was a sufficient basis for hearing the appeal. The Supreme Court in *Carlisle* ruled that Rule 45, Fed.R.Crim.P., would not permit a trial court to consider untimely post-trial motions on the basis of "excusable neglect."

trial transcript apparently isn't done." [3] (Tr. 8) I do not think my words can be construed as anything more than the grant of an extension that would have (erroneously) been given through a minute order but for the fact that Mr. Evans' attorney was in court.

Mr. Evans argues that his extension was necessary because the court reporter had not prepared the trial transcript.[4] However, Mr. Evans had not ordered the transcript until June 30, 1997, which is the reason it was going to be later than might have been expected .[5] But if Mr. Evans needed the transcript in order to file his post-trial motions it would not have made any sense to ask for only 30 days following the verdict to file his motions. Even if Mr. Evans had ordered the transcript immediately instead of waiting until half of his requested 30 day extension had passed to place the order he would not have gotten the transcript until the day his motions were due under his requested extension. Furthermore, I can find no reason why Mr. Evans could not have filed his post-trial motions without a transcript. Even if the transcript were needed to complete a memorandum in support, the motions themselves did not depend on the specificity of a transcript.

Mr. Evans says he relied on the fact that the Government did not object to his July 9 motion for an extension of time (the Government says it didn't know about the rule either) and my grant of his motion. Mr. Evans fails to point out that shortly before the trial of this case Judge Zagel had run into the same problem and issued an opinion in a case in which counsel for Mr. Evans was one of the attorneys. In *U.S. v. Boyd,* 172 F.R.D. 363 (N.D.Ill. April 4, 1997), Judge Zagel ruled that under *Carlisle* and *Hocking,* "and the plain language of the applicable Rules" he had no authority to decide motions filed under the same circumstances that Mr. Evans' motions have been filed in this case. Judge Zagel noted that while he had given the extension of time in error, he had not given the attorneys specific assurance that the motions could be filed beyond the appropriate time period. *Id.* at 367. Given Judge Zagel's recent opinion, counsel could not reasonably have relied on my authority to grant the requested extension.

■ Mr. Evans says he was also confused by and relied on Local Criminal Rule 3.01, which provides that post-trial motions for a new trial, etc. shall be supported by written memoranda "filed within ten (10) days of conviction (or such other time as the Court shall allow) unless filing is excused by the Court." The local rule is not inconsistent with Fed.R.Crim.P. 29, 33 and 45. It deals with the requirement that counsel not submit a bare bones motion without any written argument in support of it unless the court excuses filing a memorandum. The times noted in the local rule concern the date on which the memorandum in support must be filed. I do not think the rule is reasonably susceptible to confusion. Of course, if there is a conflict between a local rule and the Federal Rules of Criminal Procedure, it is a

---

3. I added a statement that the extension was with the understanding that it would be used for proper purposes. Mr. Evans understandably has not argued that this statement in any way misled him. Mr. Evans' attorneys were in court on the date in question because I had learned from the complaint of a juror that Mr. Evans and his attorneys were contacting jurors in this case in violation of Local Criminal Rule 3.02, which forbids any party, agent or attorney from contacting or attempting to contact any jurors who had heard the case without permission of the court.

4. In his motion for an extension of time, Mr. Evans had given the need for the transcript as well as the fact that his counsel was beginning another trial as the reasons for the request for an extension.

5. The transcript is in 18 volumes and includes 2,832 pages. Under 28 U.S.C. § 753(f), a court reporter may require prepayment before preparing a transcript. In this case, the reporter required partial payment at the time of the order. The Judicial Conference has determined that a transcript shall be delivered 30 days after it is ordered. Guide To Judiciary Policies and Procedures, Court Reporters Manual, Vol. VI, chapt. XX, p. 3. Counsel for Mr. Evans is an experienced criminal defense attorney who has tried numerous cases in federal court. He presumably therefore knows of this rule (and as a practical matter no one would think that a transcript running nearly 3,000 pages could be prepared in much less time). But if he did not, he could have asked how much time would be required for preparation.

familiar rule of construction that the Federal Rules of Criminal Procedure govern.[6] *Whitehouse v. U.S. District Court*, 53 F.3d 1349, 1355–56 (1st Cir.1995).

For all of these reasons, I do not think an appellate court would find exceptional circumstances in this case for failing to file post-trial motions within the time requested and granted at the time the jury returned its verdict. Nevertheless, one of the motions filed by Mr. Evans does raise an issue that would not have been known at the time the motions should have been filed, and is thus timely.

## II.

■ The timely filed motion seeks a new trial on the basis that one of the jurors in this case, Ms. Drown, might have been influenced in some way by knowledge that James Burns, the U.S. Attorney for the Northern District of Illinois at the time of trial, had an "ongoing relationship" with the law firm, Sidley & Austin, at which she was a secretary. In response, Mr. Burns has filed an affidavit.

The sequence of events is this: Trial of this case began on May 27, 1997 with jury selection. Jury deliberation began on June 12, 1997. The jury continued deliberating on June 13 and returned a verdict on June 16, 1997. In his sworn declaration, Mr. Burns states, first, that on the date trial began in this case, he had neither initiated nor participated in any discussions with any law firm, including Sidley & Austin, regarding his plans after leaving the U.S. Attorney's Office. Second, Mr. Burns states that he had a lunch meeting with two partners, longtime friends, from Sidley & Austin on June 4, 1997. He says that at that lunch meeting he told the two men that he had not yet decided whether he would leave the office of U.S. Attorney, and had made no decisions about the type of position he would seek if he left, but that he asked whether it would be realistic to pursue discussions with Sidley & Austin "if and when" he decided to seek employment with a law firm. Mr. Burns states that he was told the firm would be willing to "enter into dis-

cussions in the future," but that they made no promises of employment. Mr. Burns says he stressed that he had made no decisions about whether he would seek private employment, that he was going to talk to at least one other law firm before deciding whether to seek employment with any law firm, and that he asked them to keep both the fact of their conversation and any details about it confidential. Mr. Burns says he did not discuss the meeting either publicly or with any assistants in the U.S. Attorney's office. Mr. Burns had no further discussions with anyone at Sidley & Austin until June 16, 1997—the day the jury returned its verdict—when he again met with the two Sidley partners. At that meeting, Mr. Burns states they had only a general discussion of the type of relationship that might be possible. Mr. Burns also states that it was not until well after June 16 that he began actively to discuss potential employment at Sidley & Austin. He did not reach an agreement or decide to go to the law firm until sometime in August, 1997.

Mr. Evans asks that I hold an evidentiary hearing to explore whether juror Drown had any knowledge of Mr. Burns' "relationship" with Sidley & Austin and whether such knowledge influenced her decision in any way. On the basis of Mr. Burns' affidavit, however, there is no relationship to explore. At the time the juror was selected to serve in this case, Mr. Burns had had no meetings with anyone from Sidley & Austin. The one meeting that was held prior to the day the verdict was announced was intended to be confidential. Furthermore, there was nothing that could have been conveyed to the juror as a result of that meeting that conceivably would have had any influence on the verdict.

Mr. Evans attempts to connect Mr. Burns' future relationship with Sidley & Austin to the fact that on the first day of testimony, following lunch, juror Drown did report to me that over the lunch hour, when she had gone to Sidley & Austin to pick up some

---

**6.** Counsel's alleged reliance on this rule is questionable. On the same date that he says he requested an extension of time to file his motions in reliance on this rule, he expressed unfamiliarity with Local Criminal Rule 3.02 (which immediately follows Rule 3.01), which prohibits unauthorized contact with jurors following a verdict.

things she wanted while she was away on jury duty, a lawyer had told her he wanted to talk to her about the trial. Ms. Drown informed me that before he could say anything more, she had immediately told him she could not talk to him about the trial at all, and had immediately left. She told me that the lawyer had not told her whatever he had intended to say. She told me the attempted conversation would not prevent her from being fair and impartial to both sides. We agreed that she would not talk to anyone at Sidley & Austin until the trial was over. Ms. Drown reported the attempted conversation to me pursuant to my general instruction that if anyone should attempt to talk to any juror about the case, the juror should report that fact to me. I informed the attorneys of Ms. Drown's report to me before the jury came in after the lunch hour. I asked the attorneys whether any of them would like me to explore the topic further on the record. Mr. Evans' counsel stated that he did not.[7]

The facts before me therefore are that no one talked to juror Drown about this case or anything that could affect her verdict in this case and that Mr. Burns did not have any relationship with Sidley & Austin or even any potential relationship, at the time this trial began.

I also note that Sidley & Austin is a very large firm. The Government states, and Mr. Evans has not disputed, that the firm has over 400 attorneys in it. Thus, the likelihood that a juror who is a secretary in the firm would have any contact, or know of any contact by anyone else, with Mr. Burns at that time, is remote.

Under the circumstances described above, it would be inappropriate to hold a hearing as requested by Mr. Evans. Before a post-trial jury hearing is ordered, the courts have held that there must be "clear, strong, substantial and incontrovertible evidence ... that a specific, nonspeculative impropriety has occurred." *U.S. v. Ianniello*, 866 F.2d

540, 543 (2d Cir.1989) (quoting from earlier case). A hearing should not be held to allow a defendant to conduct a fishing expedition. *Id.* (citation omitted). As the *Ianniello* court noted, "post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts." *Id.* (citation omitted). Indeed, Fed.R.Evid. 606(b) would not allow me even to ask the juror in this case whether if she had learned that Mr. Burns might conceivably be interested in joining the law firm in which she worked, it had any effect on her verdict. *U.S. v. Sanders*, 962 F.2d 660, 673 (7th Cir. 1992). If I believed there was evidence that she had heard such a statement, I would have to determine based on my assessment of the facts whether there was any reasonable possibility that the verdict was influenced by what she had heard. *Id.*

In this case, as I have stated above, from the evidence before me the possibility that Ms. Drown heard before her verdict that Mr. Burns might join Sidley & Austin is extremely remote. The fact that he had one meeting before the last day of deliberations, at which there was an agreement that the meeting was confidential under circumstances in which it may be expected that confidentiality was respected, and at a time when Ms. Drown was not even present at the firm, in addition to the fact that even preliminary negotiations did not take place at the meeting, as well as Ms. Drown's position in the firm and the size of the firm, all render any such possibility speculative and unlikely. And if Ms. Drown had heard such a rumor (there is no evidence that there were any rumors), there is no reasonable possibility that her verdict was influenced. No reason has been offered why her verdict would have been influenced by such a possible future association, and there is no logical reason why it should have any influence.[8]

---

7. I did tell the attorneys I would write a letter to the attorney involved, informing him that his conduct was improper and that he was not to have any further conversation with Ms. Drown during the trial. I did so, sending the letter by fax that afternoon.

8. In addition, although, under the circumstances, unnecessary to this conclusion, the evidence against Mr. Evans was overwhelming. Furthermore, my observation of this juror—who has a B.S. degree in economics, courses toward a graduate degree in sociology, had lived in India

## III.

As discussed above, I do not believe I have jurisdiction to consider the other post-trial motions raised by Mr. Evans. If I were permitted to consider Mr. Evans' post-trial motions, however, I would find them to be without merit.

■ The second issue raised in Mr. Evans post-trial motions concerns the submission to the jury of an exhibit. Mr. Evans argues that Lee Servicing Exhibit 2 was improperly sent to the jury. Mr. Evans agreed to the admission of the exhibit in the form in which it was sent to the jury. In addition, the evidence is overwhelming that Mr. Evans' attorney saw the exhibit in the form in which it was admitted and sent back to the jury and never asked that it be redacted. (Of course, it would have been malpractice to have stipulated to an exhibit, and to have agreed to have it sent back to the jury, as counsel did, without looking at the exhibit. Indeed, when questioned by me, Mr. Evans' attorney did not say that he had not seen the exhibit in the form in which it went to the jury.) It was also very clear from the exhibit that only one part of it referred to Mr. Evans. There is no reasonable possibility that the form of the exhibit had any effect on the outcome of the trial.

■ Mr. Evans also argues that the Government improperly excluded from the jury two African–Americans on the basis of their race. Mr. Evans raised this challenge based on *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), during *voir dire* and I rejected it then after listening to the Government's statement of reasons for excluding the two jurors. To summarize, the Government stated that it had stricken potential juror Clay because she was an auditor who worked for the City of Chicago and it was concerned that she would use her own knowledge of city payment procedures in evaluating a mail fraud count relating to Mr. Evans' expense vouchers. The Government intended to put on its own witness with respect to the propriety of the expense vouch-

ers. I agreed that the Government's reason was valid. Understandably, it would not want someone who might have specialized knowledge in this area second guessing the Government's witness during deliberations. This is an acceptable race neutral reason for excluding a potential juror. *See Soler v. Waite,* 989 F.2d 251, 254 (7th Cir.1993). Mr. Evans argues now (although he did not raise this point during his challenge at trial) that another juror, Mr. Malleris, also had an auditing background. The record shows that Mr. Malleris, who is white, is a retired World War II army corporal and is presently post commander of his American Legion post. He described his career before he retired as follows:

> I was in partnership with my two late brothers, and we dabbled in everything. My older brother was a graduate electrical engineer. I was an accountant and an auditor. We dabbled. My younger brother spent two years in college. We dabbled in real estate, and I was a real estate broker, we dabbled in construction. We were Jacks of all trades, and we were very successful at it.

Tr. 27.

The Government could very well have thought him quite different from Ms. Clay. Not only did his interests and background in terms of American Legion and the Army make him the kind of traditional juror prosecutors are likely to want on a jury, but while he did say he had been an auditor, his working career was quite different from Ms. Clay's, who at the time of trial was working as an auditor for the City of Chicago. I conclude as I did at trial that the Government challenge of Ms. Clay has not been shown to be based on race.

■ The other African–American juror stricken by the Government, Ms. Roberts, had been convicted of a felony in the past. Clearly, this was a proper race neutral basis for exclusion. The Government also indicated at trial that it was concerned about the

and Hong Kong before moving to Chicago, and who immediately brought to my attention an attempted contact with her by an attorney in her firm—is that she would not have allowed the

possibility of a future relationship between Mr. Burns and the law firm to have influenced her decision if she had known about it.

fact that she was a member of the Order of Eastern Stars (the sister organization of the Masons) as was Mr. Evans, because Masons are sworn to support one another. The issue appeared to have arisen because Ms. Roberts stated that she was a member of the organization and when the Government asked if Mr. Evans was a member of the Masons, Mr. Evans' attorney stated that he was and intended to so testify. Mr. Evans notes that the Government did not question whether Mr. Malleris' membership in the Masons would prevent him from being a fair juror, but again Mr. Evans did not raise this issue during his *Batson* challenge. The Government says it had forgotten that Mr. Malleris was a Mason, and again, considering all of the reasons why Mr. Malleris was likely to appear to be the kind of juror the Government would like to have on a jury, I do not find the distinction suspicious. The Government also stated its concern that Ms. Roberts had solicited a particular official for business because of information that it had with respect to the particular official that it could not reveal in open court. I found the Government's concern about the suburban official and Ms. Roberts' solicitation of him credible.[9] Mr. Evans therefore failed to meet his burden to show that the Government excluded Ms. Roberts from the jury on the basis of her race.

 Mr. Evans' next objection is that I did not define "willfully" for the jury. At the instruction conference referred to in his reply brief, he requested that willfully be included with or replace knowingly. At the time I requested that counsel for Mr. Evans provide me with case authority to support a willfulness standard. We did not, so far as I can find, discuss the inclusion of a definition of willfulness in the instructions. At a subsequent instruction conference on June 10, 1997, referring to revised instructions, Mr. Evans' counsel did not object to instructions on the basis that they did not define willfulness. Mr. Evans has not pointed to any time thereafter, and I can find none, at which he indicated that he wanted an instruction that defined willfulness. Thus, Mr. Evans' objection, if he had one, is waived. *U.S. v. Salerno*, 108 F.3d 730, 740 (7th Cir.), *cert. denied*, ── U.S. ──, 117 S.Ct. 2517, 138 L.Ed.2d 1018 (1997). I also conclude that the jury instructions accurately stated the law. Willfulness is not an element of the offense of extortion. 18 U.S.C. § 1951. Thus, although it was used in the indictment and the charge, it need not be defined in the instructions. *E.g., U.S. v. Valencia*, 907 F.2d 671, 682–83 (7th Cir.1990). The Seventh Circuit Pattern Jury Instructions section 6.03 in fact recommends that an instruction on willfulness not be given in these circumstances.

 Mr. Evans also argues that the evidence was insufficient to support the jury's verdict on various counts. The first challenge is to Count 8 of the indictment and Racketeering Act 4, which charged Mr. Evans with conspiring with Edward Vrdolyak (Person "E") to commit extortion. Essentially, Mr. Evans argues that he did not testify that he committed the acts upon which the conspiracy based, nor did Mr. Vrdolyak (who did not testify). However, Dan Callaghan testified that Mr. Vrdolyak told him that if Mr. Evans were reelected he could obtain the desired permit. There was plenty of other evidence to prove Mr. Evans' participation in the conspiracy, including numerous telephone calls between Mr. Evans and Mr. Vrdolyak around the time that Mr. Callaghan paid Mr. Evans $10,000, and an absence of similar calls before Mr. Callaghan testified he had gone to Mr. Vrdolyak for help; evidence that Mr. Evans hid the $10,000, did not report it as a campaign contribution, and used it for personal expenses; and evidence that Mr. Evans changed his long-

---

**9.** In his memorandum in support of a new trial, Mr. Evans refers to a statement by me that he interprets as an indication that I had some concern that the Government had exercised its challenge to Ms. Roberts on the basis of race but would excuse it because of a belief that other African Americans would remain on the jury. Mr. Evans is incorrect. I found no reason to doubt that the Government's challenge to Ms. Roberts was based on legitimate concerns that were not based on race. My comment referred to Mr. Evans' general statement that the Government's challenges must be based on race because the jury was not going to include African Americans. I intended to say that while I thought Mr. Evans' conclusion was wrong, any strike based on race would be improper.

standing opposition to Mr. Callaghan's operation after the payment. The Government may prove a conspiracy and Mr. Evans' participation in it through circumstantial evidence. *U.S. v. Gutierrez*, 978 F.2d 1463, 1469 (7th Cir.1992). Furthermore, I must review "the evidence in the light most favorable to the government," and may overturn the verdict "only where the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *U.S. v. Hill*, 40 F.3d 164, 166 (7th Cir.1994) (internal quotations omitted). Since the record contains evidence from which the jury could find Mr. Evans guilty beyond a reasonable doubt, there is no basis for overturning the conviction on this count.

Mr. Evans also challenges the sufficiency of the evidence to convict him on Counts 9 and 13 of the indictment. These counts also relate to the $10,000 payment by Mr. Callaghan to Mr. Evans. For the reasons discussed above, Mr. Evans' challenges to his convictions on these counts must fail.

■ Mr. Evans' next challenge to the sufficiency of the evidence concerns Counts 10 through 12 and Racketeering Act 5 of Count 1. These counts all involved fraudulent billings to the city of Chicago. The jury heard evidence that Mr. Evans submitted insurance and maintenance expenses for his and his wife's cars. The applicable Chicago ordinance permitted an alderman to obtain full reimbursement for "a motor vehicle" used in connection with official duties. At trial Mr. Evans attempted to persuade the jury that "a" was vague and that he believed it was acceptable to bill for two cars. But in addition to the language of the ordinance, there was also evidence that Mr. Evans did not tell his chief of staff that he was billing both cars to the City, and that he referred to the cars as "Alderman's car" in billing statements. In short there was sufficient evidence for the jury to conclude that Mr. Evans knowingly defrauded the City.

■ Mr. Evans also challenges the sufficiency of the evidence to convict him of Count 6 and Racketeering Act 3 of Count 1. These counts involved alleged extortion of Ishan Sweiss in connection with Mr. Sweiss' application for a liquor license. Mr. Sweiss had not actually applied for a license when he contributed $1,000 to Mr. Evans' fundraiser in January, 1995. Mr. Sweiss testified, however, that well before this Mr. Evans knew that Mr. Sweiss wanted his help on his upcoming request for a liquor license for his grocery store and that Mr. Evans in December, 1994, had specifically tied a request for contributions to his help with the liquor license. The evidence with respect to a new basement floor that Mr. Sweiss paid for in Mr. Evans' home was that Mr. Evans accepted the floor knowing that Mr. Sweiss wanted help with a liquor license. The evidence was sufficient to support the verdict.

■ The evidence to support conviction on Counts 14 and 15, which charged Mr. Evans with filing false tax returns for 1993 and 1994, was that Mr. Evans failed to report bribes in the amount of $7,300 and campaign funds that he used for personal expenses. Mr. Evans tried to persuade the jury that trips that he and his wife took were actually business trips and that his personal use of campaign funds was justified because the funds used were actually repayment of loans he had made to his campaign for alderman in 1987. The Government produced substantial testimony, including taped statements by Mr. Evans, to contradict the first claim. The jury was entitled to conclude that the total lack of corroborating documentation with respect to the second claim showed its falsity. With respect to both counts, the verdicts were well substantiated by the evidence.

■ Mr. Evans finally challenges the sufficiency of the evidence to convict him of obstruction of justice, as charged in Count 16 of the indictment. That count charged Mr. Evans with corruptly endeavoring to obstruct and impede the due administration of justice by failing to produce to a grand jury two Ashland State Bank deposit slips showing the two $5,000 payments from Dan Callaghan. Mr. Evans argues that the evidence showed that he had produced the Ashland State Bank deposit slips to the attorney who was representing him at the time, Mike Monico, and that he assumed Mr. Monico produced them to the grand jury. But Mr. Monico's

stipulated grand jury testimony was that Mr. Evans did not give him these documents during the period when Mr. Evans was bringing in documents in response to the grand jury subpoena. Mr. Monico did say that Mr. Evans brought these two documents (although no others from the Ashland Bank) to him but that they were brought in connection with another matter. He also testified that these deposit slips were brought in after the other documents that were to go to the grand jury and after he had completed copying of the documents for the grand jury. In addition, while Mr. Evans told an FBI agent that he had an old account at Ashland State Bank (Tr. 1453), he told him he had only received a couple of turkeys from Mr. Callaghan. He did not tell him about the $10,000 deposited at that bank. From this evidence, the jury could conclude that Mr. Evans intended to obstruct the grand jury.

 Mr. Evans also argues that he was deprived of a fair trial because he did not learn of impeaching material with regard to witness James Koch until after both sides had rested. Mr. Evans admits, however, that the material was timely faxed to his counsel's office. The Government represents that this method was routinely used to provide Mr. Evans with materials before and during trial. Mr. Evans has not attempted to rebut this statement or to explain why in this instance, his counsel's office staff did not provide the material to counsel. Furthermore, Mr. Evans admits that his counsel had the material before closing argument. Yet he did not seek to reopen the evidence or even bring the matter to my attention. Any error was therefore waived. *U.S. v. Diaz–Villafane*, 874 F.2d 43, 47 (1st Cir.1989). Finally, the materials had nothing to do with the issues in this case. There is not a remote possibility that the outcome of the trial would have been different if counsel had cross-examined Mr. Koch about the matter in the disclosure.

 Mr. Evans also argues that he was deprived of a fair trial because I did not ask members of the jury, on a daily basis, whether they had read or seen any of the news reports about the trial. Mr. Evans cites no authority that indicates I should have fol-

lowed this procedure and I know of none. Indeed, such an inquiry would seem to call undue attention to media reports. At any rate, I repeatedly reminded the jury that it must avoid hearing or seeing media reports about the trial. *E.g.*, tr. 118, 256, 413, 1978. Mr. Evans did not request that I remind the jurors of this obligation more frequently than I did.

 Mr. Evans argues that a response given to a question from the jury was improper. The question, relating to Count 6 of the indictment, asked whether the indictment was in error when it stated that Person A had a license application pending and whether if so, the indictment needed to be corrected. My response, given after consultation with counsel, was that

[t]he jury has correctly observed that the second paragraph of page 27 of the indictment contains an error because person B and not person A had pending a liquor license application. Because the erroneous language does not itself relate to an element of the charged offense as stated in the instructions, you may consider Count 6 as though the error had not been made.

In fact, Count 6 of the indictment incorporated by reference the allegations of Count 1, which accurately stated that the applicant was Person B. At the time I discussed the response with counsel, Mr. Evans wanted me to answer the question with a "yes" or "no" answer. That would not have provided a sufficiently accurate response, however, and thus would have been improper. *U.S. v. Adcox*, 19 F.3d 290, 293 (7th Cir.1994).

 Mr. Evans' last claim of error is that an FBI agent testified in response to a defense question about another FBI agent's demeanor while interrogating Mr. Evans that the second agent was calmer than the testifying agent and is a "Deacon in his church." Tr. 1546. Mr. Evans argues that Fed. R.Evid. 610 prohibits evidence of the beliefs or opinions of a witness on matters of religion to show "that by reason of their nature the witness' credibility is impaired or enhanced." It is not clear that the comment would come within that prohibition. At any rate, Mr. Evans' counsel did not object to the

comment at trial, responding instead with a question whether the witness was aware that Mr. Evans was also a deacon. Tr. 1546. Since Mr. Evans did not object to the statement at trial, it is reviewable only for plain error. It is certain that this off-hand remark, countered by the evidence that Mr. Evans was also a deacon, did not prejudice Mr. Evans.

Mr. Evans raised numerous other alleged errors in his brief but did not explain any of them. The failure to do so violates Local Criminal Rule 3.01, which requires a memorandum in support of any alleged error. They are therefore waived.

### Conclusion

For the reasons stated at the beginning of this opinion, Mr. Evans waived all but one of the issues raised in his post-trial motions by failing to raise them in a timely fashion. I find no merit as to the issue over which I find jurisdiction, or on any of the remaining issues if they are properly considered.